UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ARNALDO DE LA VEGA and
NIDIA DE LA VEGA

       Plaintiffs,

v.                             Case No:  2:22-cv-120-JLB-NPM

HUDSON INSURANCE
COMPANY,

       Defendant.

_____/

## ORDER

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment (Doc. 36) and Defendant's Motion for Summary Judgment (Doc. 37). Plaintiffs and Defendant filed responses to each other's summary judgment motions (*see* Docs. 41, 42), and they each filed replies in support of their respective summary judgment motions (*see* Docs. 44, 45).

Pursuant to Count II of the Complaint, Plaintiffs ask this Court to declare that (i) Defendant's insurance policy provides excess uninsured/underinsured motorist ("UM") coverage in the amount of $1,000,000 due to Defendant's failure to make UM coverage available as required by Florida law; and (ii) Defendant's policy is ambiguous and, as such, provides UM coverage in the amount of $1,000,000. (Doc. 36 at 1). Defendant contends that Plaintiffs failed to successfully add automobile coverage and UM coverage to their umbrella policy and, accordingly, Defendant does not owe any UM benefits to Plaintiffs for the May 15, 2021

1

automobile accident.  (Doc. 37 at 1–2).  Defendant also seeks a ruling that it is not bound to provide UM coverage under a theory of promissory estoppel (Count III).  (Doc. 37 at 22–23).  Having considered the evidence in the record, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 37) and **DENIES** Plaintiffs' Motion for Summary Judgment (Doc. 36).  The Court also dismisses Count I, a Florida negligence claim, as it was contingent upon the Court's coverage rulings in Counts II and III.

## BACKGROUND

On May 15, 2021, Arnaldo De La Vega was in a car accident with an uninsured motorist.  (Doc. 36-4 at 2).  Allstate Insurance Company, his automobile insurer, subsequently tendered its $100,000.00 uninsured motorist limits to him.  (Doc. 36 at ¶ 1; Doc. 42 at ¶ 1; Doc. 36-4 at 2).  At the time of the accident, Mr. De La Vega was also a named insured under a personal umbrella policy (the initial policy and all renewals of such policy are referred to herein as the "Umbrella Policy") issued by Hudson Insurance Company ("Hudson") in Florida, Policy Number 0021956-06, with a policy period of March 12, 2021 through March 12, 2022.  (Doc. 36 at ¶ 2; Doc. 42 at ¶ 2; Doc. 37-1).  Mr. De La Vega sought UM benefits under the Umbrella Policy.  (Doc. 36 at ¶ 3; Doc. 42 at ¶ 3).  Hudson, however, maintains that De La Vega's Umbrella Policy did not have UM coverage.  (Doc. 36 at ¶ 3).

In all events, the Umbrella Policy was initially purchased through an insurance agency, Assured Partners of Florida LLC ("Assured"), formerly known as

IRMS.  (Doc. 36 at ¶ 5; Doc. 42 at ¶ 5; Doc. 36-1 at 5–6).[1]  Dawn Zettler, an employee at Assured, handled the application for the Umbrella Policy.  (Doc. 36 at ¶ 6; Doc. 42 at ¶ 6; Doc. 36-1 at 11–12; Doc. 36-2 at 10).  Typically, Hudson provides Assured with application forms and sample policies, and generally communicates its underwriting guidelines.  (Doc. 36 at ¶ 7; Doc. 42 at ¶ 7; Doc. 36-1 at 8).  The applications taken by Assured are then submitted to another company, MyMGA, which is a broker that represents Hudson.  (Doc. 36 at ¶ 8; Doc. 42 at ¶ 8; Doc. 36-1 at 11).  MyMGA's role is "another level of intermediary."  (Doc. 36-1 at 12).  MyMGA "ha[s] underwriting authority that allows them to bind coverage."  (Doc. 36 at ¶ 8; Doc. 42 at ¶ 8; Doc 36-1 at 25–26).

Tatiana De La Vega, Mr. De La Vega's daughter (Doc. 36 at ¶ 9; Doc. 42 at ¶ 9; Doc. 36-3 at 12), testified that she spoke with Dawn Zettler in person to help her parents obtain the Umbrella Policy.  (Doc. 36-3 at 24–25).  Ms. Zettler testified that she was not sure if the conversation was in person or by email.  (Doc. 36-2 at 29).  In any event, Ms. Zettler informed Ms. De La Vega that a 2013 umbrella policy with American Alternative could not be renewed.  (Doc. 36 at ¶ 11; Doc. 42 at ¶ 11; Doc. 36-3 at 28).  Ms. Zettler then e-mailed Ms. De La Vega a pre-filled application for Hudson.  (Doc. 36 at ¶ 12; Doc. 42 at ¶ 12; Doc. 36-3 at 28, 34–35).  The pre-filled application stated: "Uninsured and Underinsured Motorist Not Covered."  (Doc. 36 at ¶ 13; Doc. 42 at ¶ 13; Doc. 36-6 at 2).  An insurance summary prepared by Ms.

---

[1] Assured purchased IRMS in 2017 and took over existing IRMS business, including the Umbrella Policy.  (Doc. 36 at ¶ 5; Doc. 42 at ¶ 5; Doc. 36-1 at 5–6).

Zettler and dated February 13, 2014 also stated that automobile liability and excess uninsured motorist were not included in the coverage.  (Doc. 36-7 at 2, 6).  Ms. Zettler explained that the insurance summary is a template that she usually fills in based on an insurance quote from the carrier that proposes the better option for the client.  (Doc. 36-2 at 13).

Plaintiffs claim that the application "include[d] some auto questions which were answered." (Doc. 36 at ¶ 16).  Indeed, the "Underwriting Questions" section of the pre-filled Primary Personal Umbrella Application asks questions seemingly related to automobile coverage, such as whether any driver was convicted for traffic violations in the last 3 years or whether any driver had mental or physical impairments, and answers are marked "No" in Plaintiffs' application.  (Doc. 37-4 at 4).  But the Primary Personal Umbrella Application, signed on March 7, 2014, indicates no automobiles or recreational vehicles owned and/or leased.  (Doc. 37-4 at 3).  And Ms. Zettler testified that "none" indicates that no automobile information was inputted.  (Doc. 36-2 at 69 ("Q. Okay. But this application would not have just generated 'none' under Automobile.  It's because no automobile was input; is that correct? A. Correct. Yes.")).

Based on an email from Ms. Zettler to MyMGA on March 10, 2014, it appears that motor vehicle reports were ordered in connection with the Umbrella Policy application, but no such motor vehicle reports are attached.  (*See* Doc. 36-9).  Ms. Zettler does not recall ordering a motor vehicle report for the Umbrella Policy

application but testified that motor vehicle reports are typically ordered to "verify a driving record." (Doc. 36-2 at 46–47).

Under "Type of Coverage" on the Policy Declarations page of the Umbrella Policy, the "Minimum Underlying Limits" states "SEE ATTACHED SCHEDULE – HUD-PUMB0007." (Doc. 36-5 at 2; Doc. 37-1 at 2). HUD-PUMB0007 has spaces where details about automobiles may be listed, but no automobiles are listed. (Doc. 36-5 at 14; Doc. 37-1 at 14). And the following page states that "[t]he coverages provided by this policy do not apply to 'bodily injury' or 'property damage' arising out of . . . [t]he ownership of any 'auto' by an 'insured.'" (Doc. 36-5 at 16; Doc. 37-1 at 16). George Schmelzle, an employee of Assured, stated multiple times during his deposition that the Umbrella Policy did not include automobile liability. (*See* Doc. 36-1 at 38, 72, 76–77, 86–88, 95). Ms. De La Vega also testified that she interpreted the exclusion to mean that the policy did not provide automobile liability and UM coverage. (*See* Doc. 36-3 at 55–57).

In March 2020, per Policy Notes from Assured, Plaintiffs requested a renewal of the Umbrella Policy and asked to add two vehicles to the policy. (Doc. 36-12 at 2). On March 10, 2020, March 17, 2020, and March 23, 2020, Assured sent emails to Ms. De La Vega requesting information on those vehicles. (Doc. 36 at ¶ 32; Doc. 42 at ¶ 32; Doc. 36-13). UM coverage was not mentioned in the emails. (Doc. 36-13). The renewal was processed without automobile insurance because Plaintiffs did not provide certain requested information about the vehicles or the drivers in the household. (Doc. 36-12 at 2). Ms. De La Vega testified that she believed she did not

respond to those emails because "they were asking about the autos for the umbrella, but the policy doesn't offer auto or uninsured motorist, so that's why I didn't respond. . . .  I can't remember if I responded or not, though."  (Doc. 36 at ¶ 35; Doc. 42 at ¶ 35; Doc. 36-3 at 40).

In March 2021, again per the Policy Notes, Plaintiffs wrote in some information related to automobiles but the renewal was processed without automobile coverage.  (Doc. 37-16 at 2; Doc. 37-1).  Shelsy Urbina, from MyMGA, sent an email to Ms. Zettler, stating that "[i]f the insured would like to move forward with adding auto coverage, please confirm and provide the requested information below."  (Doc. 37-16 at 2).  The information requested was the "[u]nderlying carrier & liability limit" and a "[s]igned UM form indicating UM limit."  (*Id.*).  It is unclear whether those requests were communicated to Plaintiffs.  Regardless, however, there is no evidence that an auto insurance policy was ever issued by Hudson to Plaintiffs.  (*See, e.g.*, Doc. 36-2 at 85 ("Q. Was auto coverage ever added to that 2021-2022 policy?  A. I don't believe so"); Doc. 36-3 at 44 ("Q. Okay. But prior to your father's accident on May 15th, 2021, did you speak to the agent about adding UM coverage?  A. No, because it was not offered.  The policy kept saying autos are . . . excluded.")).  Moreover, the Policy Notes attached to Plaintiffs' Motion for Summary Judgment indicate that the amount paid to renew the Umbrella Policy—$310.00—did not change from 2019 through 2021; in other words, Plaintiffs paid $310.00 to renew the Umbrella Policy in each of those years.  (Doc. 36-12 at 2–6).

**DISCUSSION**

## I.   Count II – Declaratory Judgment Action

Plaintiffs claim that, due to an accident with an uninsured motorist, Mr. De La Vega sustained severe permanent personal injuries and that Hudson is liable for the uninsured motorist's negligence through its Umbrella Policy. (Doc. 4 at ¶¶ 11– 15). Plaintiffs seek a judicial determination that the Umbrella Policy provides $1 million in excess UM coverage for the following reasons:

> a)   HIC failed to notify DE LA VEGA that he was entitled to purchase uninsured/underinsured motorist coverage as required by F.S. 627.727(2);
> b)   That the policy by its terms provides excess uninsured/underinsured coverage for the incident causing DE LA VEGA'S injuries;
> c)   That DE LA VEGA[ ] as a Class I insured under the policy is entitled to uninsured/underinsured coverage under the policy regardless of F.S. 627.727(2);
> d)   That the policy when reading the declarations page, insuring agreement and endorsements is ambiguous and reading the policy in a light most favorable to the insured it provides excess uninsured/underinsured motorist coverage to the Plaintiff in the amount of one million dollars.

(Doc. 4 at ¶ 17).

Resolving Count II boils down to two issues: First, where an individual requests a renewal of an umbrella policy and adds information regarding motor vehicles but no motor vehicle policy is issued, does Florida Statute § 627.727(2) require that the insurer notify the insured that UM coverage is available? And, second, is the Umbrella Policy ambiguous such that the Court cannot decide its meaning as a matter of law?

Florida law requires that "[t]he starting point for the interpretation of a statute is always its language, so that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Jefferson v. State*, 264 So. 3d 1019, 1024 (Fla. 2d DCA 2018) (quoting *Vargas v. Enter. Leasing Co.*, 993 So. 2d 614, 618 (Fla. 4th DCA 2008)) (quotation marks omitted). Florida courts "discern legislative intent by analyzing the text of the statute, interpreting the words and phrases penned by the legislature in accord with their plain and ordinary meanings." *Id.* (citing *Baden v. Baden*, 260 So. 3d 1108 (Fla. 2d DCA Nov. 14, 2018)). "And 'when the language to be construed is unambiguous, it must be accorded its plain and ordinary meaning.'" *Id.* (quoting *Brown v. State*, 715 So. 2d 241, 243 (Fla. 1998)).

As to the first question, the Court finds that the plain language of Florida Statute § 627.727 dictates that subsection (1) does not apply to an umbrella policy that does not provide motor vehicle insurance and subsection (2) does not apply where a motor vehicle insurance policy was never issued.

Florida Statute § 627.727(1) states, in relevant part:

> No ***motor vehicle liability insurance policy*** which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto . . . .

Fla. Stat. § 627.727(1) (emphasis added). And Florida Statute § 627.727(2) provides that "[t]he limits of uninsured motorist coverage shall be not be less than the limits

of bodily injury liability insurance . . . ." Fla. Stat. § 627.727(2).  The section also

provides that:

> The limits set forth in this subsection, and the provisions
> of subsection (1) which require uninsured motorist
> coverage to be provided in every motor vehicle policy
> delivered or issued for delivery in this state, do not apply
> to any policy which does not provide primary liability
> insurance that includes coverage for liabilities arising from
> the maintenance, operation, or use of a specifically insured
> motor vehicle.  However, ***an insurer issuing such a
> policy*** shall make available as a part of the application for
> such policy, and at the written request of an insured, limits
> up to the bodily injury liability limits contained in such
> policy or $1 million, whichever is less.

*Id.* (emphasis added).

Section 627.727(1) unambiguously applies only to primary motor vehicle

liability insurance policies, *see* Fla. Stat. § 627.727(2) ("[T]he provisions of

subsection (1) which require uninsured motorist coverage to be provided . . . do not

apply to any policy which does not provide primary liability insurance . . . ."), and

section 627.727(2) clarifies that the previous subsection does not apply to any policy

"which does not provide primary liability insurance that includes coverage for

liabilities arising from the maintenance, operation, or use of a specifically insured

motor vehicle," Fla. Stat. § 627.727(2).  The statute continues that "an insurer

issuing such a policy shall make available as part of the application for such policy .

. . limits up to the bodily injury liability limits contained in such policy or $1

million, whichever is less."  *Id.*

Because Florida Statute § 627.727 is wholly unambiguous, it must be

accorded its plain and ordinary meaning.  *See Jefferson*, 264 So. 3d at 1024.

Subsection (1) does not apply because the Umbrella Policy is clearly not a primary motor vehicle liability insurance policy. There is record evidence that Plaintiffs attempted to add auto insurance to the Umbrella Policy, but no motor vehicle insurance policy was ever issued, and thus subsection (2) does not apply to the Umbrella Policy because Hudson is not an insurer "issuing" an excess motor vehicle insurance policy. *See* Fla. Stat. § 627.727(2); *see also Black's Law Dictionary, Issue* ("To be put forth officially" or "[t]o send out or distribute officially"). Accordingly, Plaintiffs' argument that Fla. Stat. § 627.727 grants them UM coverage must fail.

As to the second question, the Court finds that the Umbrella Policy is unambiguous. In Florida, "[w]hen an insurance contract is not ambiguous, it must be given effect as written." *Allstate Ins. Co. v. Suarez*, 833 So. 3d 762, 765 (Fla. 2002). "Whether a contract is ambiguous is a question of law." *Holmes v. Fla. A&M University by and Through Board of Trustees*, 260 So. 3d 400, 404 (Fla. 1st DCA 2018) (quoting *Talbott v. First Bank Florida, FSB*, 59 So. 3d 243, 245 (Fla. 4th DCA 2011)). The existence of an ambiguity in a contract may preclude the entry of summary judgment. *Id.* at 403–04.

Plaintiffs argue that Hudson, "by adding an 's' to the word coverage in a liability exclusion (Coverage A) seeks to exclude the uninsured motorist coverage which is provided in Coverage B." (Doc. 36 at 19). The Court disagrees. The exclusion to the Umbrella Policy plainly states that "[t]he coverages provided by this policy do not apply to 'bodily injury' or 'property damage' arising out of . . . [t]he ownership of any auto by an 'insured.'" (Doc. 36-5 at 16; Doc. 37-1 at 16). The

10

Court cannot find that this statement is ambiguous because it cannot find that it is susceptible to more than one reasonable interpretation. *See Talbott*, 59 So. 3d at 245 ("Where . . . a contract term is susceptible to more than one reasonable interpretation, extrinsic evidence may be considered by the court to ascertain the intent of the parties.").[2]  Indeed, even if extrinsic evidence were considered here (which it should not be, because the contract is unambiguous), both Assured's representative and Ms. De La Vega testified to their understanding that the exclusion meant that the policy did not provide automobile liability or UM coverage. (Doc. 36-1 at 38, 72, 76–77, 86–88, 95; Doc. 36-3 at 55–57).

Based on the foregoing, the Court finds that Fla. Stat. § 627.727 does not apply to the Umbrella Policy and the terms of the Umbrella Policy are unambiguous.  Simply stated, there is no UM coverage provided under the Umbrella Policy.  Therefore, with respect to Count II, the Court **GRANTS** Defendant's Motion and **DENIES** Plaintiffs' Motion.

## II.     Count III – Promissory Estoppel

Plaintiffs' final argument is that finding that the Umbrella Policy does not provide UM coverage would be an injustice, and as such, Defendant is estopped

---

[2] Moreover, the policy contains an endorsement entitled the "Excess Uninsured/Underinsured Motorist Coverage Endorsement," which indicates that "[t]he company will pay those sums which the insured . . . shall become legally entitled to recover as damages because of bodily injury which is covered by the Uninsured/Underinsured Motorists Insurance of [t]he Automobile Liability policy scheduled in item 7(b) of the Declarations."  (Doc. 37-1 at 18).  And the Declarations point to "HUD-PUMB0007" for automobile liability, which lists no automobiles. (Doc. 37-1 at 2, 14).  This section of the Umbrella Policy is also unambiguous that it does not provide automobile liability or UM coverage.

from making that claim.  (Doc. 4 at ¶¶ 19–25).  Generally, promissory estoppel is "the principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor should have reasonably expected the promisee to rely on the promise and if the promisee did actually rely on the promise to his or her detriment."  *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 93 (Fla. 2013) (citing *Black's Law Dictionary* 631 (9th ed. 2009)).  "As the definition indicates, promissory estoppel traditionally serves as an exception to the requirement of consideration in the formation of a contract."  *Id.* (citing *Se. Sales & Serv. Co. v. T.T. Watson, Inc.*, 172 So. 2d 239, 241 (Fla. 2d DCA 1965)).  To establish a claim for promissory estoppel as an alternative basis for recovery, Florida law requires a plaintiff to establish that:

> (1) the promisor made a representation as to a material fact that is contrary to a later-asserted position; (2) the promisee reasonably relied on the representation; and (3) the promisee changed his or her position to his or her detriment based on the representation.

*JN Auto Collection, Corp. v. U.S. Sec. Ins. Co.*, 59 So. 3d 256, 258 (Fla. 3d DCA 2011) (citations omitted).

Generally, insurance coverage cannot be extended by estoppel, but promissory estoppel is an exception to this general rule and should be applied where "to refuse to enforce the promise 'would be virtually to sanction the perpetration of fraud or would result in other injustice.'"  *Id.* at 257–58 (quoting *Crown Life Ins. Co. v. McBride*, 517 So. 2d 660, 661 (Fla. 1987)).  "[T]his represents a 'very narrow exception' to the general rule that 'equitable estoppel may be used to prevent a

forfeiture of insurance coverage but not to create coverage where none exists.'"
*Tome v. State Farm Fire & Cas. Co.*, 125 So. 3d 864, 867 (Fla. 4th DCA 2013)
(citations omitted).  "For promissory estoppel to be applied, the evidence must be
clear and convincing."  *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 925
(Fla. 1989); *see also Horn v. Liberty Ins. Underwriters, Inc.*, 391 F. Supp. 3d 1157,
1166 (S.D. Fla. 2019), *aff'd*, 998 F.3d 1289 (11th Cir. 2021) ("Coverage by
promissory estoppel is an extraordinary remedy that must be proven through clear
and convincing evidence.").

Plaintiffs allege that they "reasonably believed [they] had purchased
uninsured motorist coverage for the subject vehicle" after answering the questions
on the Offer to Renew which included "information requesting the All Owned
Automobiles, All Household Drivers and information concerning driver history."
(Doc. 4 at ¶¶ 20–22).  The underwriting questions ask questions such as whether
any driver was convicted for traffic violations in the last 3 years or whether any
driver had mental or physical impairments, all questions that Plaintiffs answered.
(Doc. 37-4 at 4).  But the pre-filled application, signed on March 7, 2014, indicates
no automobiles or recreational vehicles owned and/or leased.  (Doc. 37-4 at 3).  And
Ms. Zettler testified that "none" indicates that no automobile information was
inputted.  (Doc. 36-2 at 69 ("Q. Okay.  But this application would not have just
generated 'none' under Automobile.  It's because no automobile was input; is that
correct?  A. Correct.  Yes.")).

13

There is simply no evidence that Hudson made a representation that motor vehicle insurance or UM coverage would be provided under the Umbrella Policy. Even a brief glance at the Umbrella Policy shows that there is no automobile coverage, and there is no evidence in the record that anyone at Hudson represented that automobile coverage would be added.  Moreover, Plaintiffs' payment for renewal of the Umbrella Policy remained $310 for each renewal from 2019 to 2021, such that even if a promise had been made, this Court would have serious reservations about whether Plaintiffs' reliance on any such alleged promise could be construed as reasonable.  (*See* Doc. 36-12 at 2–6).  But because the Court finds that no promise of UM coverage was made, Defendant is entitled to summary judgment as to Count III of the Complaint.  *See Tome*, 125 So. 3d at 867 ("Regarding the representation element, courts have required that the promise be definite, and when the promise is entirely indefinite as to terms and time, this is insufficient to support an estoppel claim.") (citations and internal quotation marks omitted).

## III.   Count I – Florida negligence claim.

Count I, a Florida tort claim, alleges that Defendant is liable under the Umbrella Policy for the negligent acts of the uninsured motorist who injured Mr. De La Vega.  (Doc.  4 at ¶¶ 11–15 (stating that Hudson is "legally liable for the negligence of the uninsured motorist")).  This Court previously granted Defendants' unopposed motion to stay litigation of Count I, pending this Court's resolution of Counts II and III.  (Doc. 11).  Because Count I is wholly dependent on the existence of UM coverage in the first instance and the Court has held that no such coverage

14

exists, the Court dismisses Count I without prejudice. *See Leedom Mgmt. Grp., Inc. v. Perlmutter*, No. 8:11-cv-2108-T-33TBM, 2012 WL 503904, at *6 (M.D. Fla. Feb. 15, 2012) ("As the constructive fraud count is dependent on the breach of fiduciary duty count, the constructive fraud count must also be dismissed."); *see also* (Doc. 11 ("[T]he coverage issues in Counts II and III may resolve the claim in Count I.")).

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion (Doc. 36) is **DENIED** and Defendant's Motion (Doc. 37) is **GRANTED** as to Counts II and III.  The stay as to Count I (*see* Doc. 11) is **LIFTED**, and Count I is dismissed without prejudice.  The Clerk of Court is **DIRECTED** to terminate all deadlines, deny any pending motions as moot, and close this case.

**ORDERED** in Fort Myers, Florida on July 26, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE